STATE LOAN COMPANY OF MINNEAPOLIS, a Corporation,
Respondent, v. WHITE EARTH COAL MINING BRICK &
TILE COMPANY, a Corporation, Janney Semple Hill & Com-
pany, a Corporation, Ole Ellingson, John Fitzgerald, a Corpo-
ration, Smith Samson, Sol Thomas, John E. Elliott, E. J. Thomas,
D. Winn, Everett Musselman, Defendants, and St. Anthony &
Dakota Elevator Company, a Corporation, Appellant.

(157 N. W. 834.)

Action to foreclose real estate mortgage. The appealing defendant claims
under a mechanic's lien. Trial *de novo*. The elevator company furnished
lumber to the coal company under contract dated November 13, 1908, for build-
ings to be erected upon the N. W. ¼ of section 15, 156–94, which was owned by
it and upon which it operated a coal mine. The openings of the coal mine,
however, being some 80 feet over on section 16, the buildings were placed
thereon from 80 to 200 feet from section 15. December 8, 1908, plaintiff took
a $2,500 real estate mortgage upon the N.W.¼ of section 15. At the time the
loan was made the manager of the coal company told the managing agent of
the loan company that he needed the money to take care of some lumber bills
in connection with the mine.

**Real estate mortgage — action to foreclose — mechanic's lien — description
— use of materials furnished — on land other than stated in contract —
lien attached where materials were used.**

1. Under our statutes, enumerated in the opinion, it is held that the lien
attached to the N. W. ¼ of section 15, although the lumber was used in the
erection of buildings upon section 16.

**Mortgage — mechanic's lien — priority.**

2. Under our statute, set forth in the opinion, it is held that the mechanic's
lien is prior to, and superior to, the mortgage.

**Trial court — equitable powers — debt — apportionment of — third persons
—protection of — buildings — sale of — provision for — security on land
— resort to.**

3. Under general equitable powers the trial court has the right to apportion
the debt in order to protect as much as possible the rights of third persons.
Therefore, the trial court should make provision for the sale of the buildings
upon section 16 before resorting to the security of the land upon section 15.

Opinion filed March 4, 1916.   Rehearing denied April 27, 1916.

Appeal from the District Court of Mountrail County, *Frank E. Fisk, J.*

Modified.

*C. Aurland,* for appellant.

Under our statute a materialman has a lien upon the land to improve which the materials were furnished under a contract with the owner thereof, for the value of the materials furnished, though the same were not used for or in such improvement or at all. Rev. Codes 1905, §§ 6237, 6271, Comp. Laws 1913, §§ 6814, 6851; Totten & H. Iron & Steel Foundry Co· v. Muncie Nail Co. 148 Ind. 372, 47 N. E. 703; Schlosser v. Moores, 16 N. D. 185, 112 N. W. 78.

The materials were furnised by appellant in accordance with its contract with the landowner, and a lien was filed for security, as against said described land, but the materials were used by such owner in building improvements on another piece of land adjoining and near by. Such lien is valid. Frudden Lumber Co. v. Kinnan, 117 Iowa, 93, 90 N. W. 515; A. E. Shorthill Co. v. Ætna Indemnity Co. — Iowa, —, 124 N. W. 613.

The materials were used in improving defendant's coal mine, and a distance of only 200 feet from the line of section 15, described in the contract. These buildings were a necessary part of the equipment for the operation of its mine, and should be deemed a part of such improvements on the defendant's mining property. Stewart-Chute Lumber Co. v. Missouri P. R. Co. 28 Neb. 39, 44 N. W. 47.

The furnishing of the materials under the contract with the landowner gives the right to the lien; the filing of the statement in the clerk's office perfects the right and establishes the lien. Haxtun Steam Heater Co. v. Gordon, 2 N. D. 246, 33 Am. St. Rep. 776, 50 N. W. 708.

The including of a description of extra land is mere surplusage, and does not vitiate the lien. Rev. Codes 1905, § 6683, Comp. Laws, 1913, § 7270; North Star Iron Works Co. v. Strong, 33 Minn. 1, 21 N. W. 740; Smith v. Headley, 33 Minn. 384, 23 N. W. 550.

Appellant's lien is prior to plaintiff's mortgage, even as to section 16 of the land described;—plaintiff had notice thereof. Rev. Codes 1905, § 6242; Comp. Laws 1913, § 6822.

*Palda, Aaker, & Greene,* for respondent.

The plaintiff's mortgage attached and became a prior lien on the quar-

ter of land in section 15, and appellant's mechanic's lien is inferior thereto, if it be a lien at all on said land. Rockel, Mechanics' Liens, § 134; Smith v. Barnes, 38 Minn. 240, 36 N. W. 346.

BURKE, J. This is a trial *de novo,* and the facts upon which this opinion is based are either undisputed or determined by us. The defendant coal company at all the times hereinafter mentioned was the owner of the N. W. ¼ of section 15, 156–94, and apparently was the lessee of the N. E. ¼ of section 16, adjoining. This latter tract is a school section. On the 13th of November, 1908, the coal company made a contract with the St. Anthony & Dakota Elevator Company to furnish certain building materials to the value of $1,145.90, which were to be used in erecting buildings at or near the opening of the mine. The first of the lumber was furnished November 13th and the last, December 24, 1908. All of said lumber was used in the erection of a cook house, bunk houses, entrance shed, engine house, dining room, and barns, but said buildings were placed upon section 16, adjoining, being some 200 feet from the line. There is no evidence that any of the lumber was used in the coal mine upon section 15, the testimony being that native trees were cut for posts for this purpose. The first consignment of lumber was upon the grounds on the 13th of November, 1908. On the 8th of December, 1908, the coal company made, executed, and delivered a real estate mortgage upon said N. W. ¼ of section 15, securing the sum of $2,500. Through a clerical error the description was written the S. W. ¼ instead of the N. W. ¼, and the same was recorded with the register of deeds on the 11th of December, 1908. The managing agent of the loan company did not visit the premises before taking the loan, but testifies that he was vice president and treasurer of the plaintiff company; that he personally negotiated the loan represented by the note and mortgage in this case; that his negotiations were with Mr. Kay, the manager of the coal mine; that before making the loan he made no inspection whatever of the property.

He was then asked:

Q. Did you learn from Mr. Kay or anybody else at the time that the loan was made, that there was being material furnished by the defendant or anybody else for the construction of the buildings or other improvements on the N. W. ¼ of section 15?

A. Why, I understood that what he needed this money for was to take care of some little bills of that nature, possibly. (His attorney: Just a moment. Read the question.)

(The question was read.)

A. No, sir. I did not.

Q. You understood that there was being material furnished for the improvements on the mining property?

A. Yes, sir.

Q. And did you know, or were you informed at that time by Mr. Kay or anybody else, that a part of their mining property was in section 16 or any other than the land covered in the mortgage?

A. Yes, sir.

Q. When did you first see the mining property in question?

A. I think it was—it was the following spring or summer. The summer of 1909.

Q. You were out there, went in and saw the place?

A. Yes, sir.

Q. Did you go into the mine out there?

A. Yes, sir. I went all through it.

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .

Q. On either of these occasions what, if any, improvements in the way of buildings or other improvements in which building material of any kind was used did you find on the northwest quarter of 15?

A. There were no buildings or any improvements whatever on the northwest of 15 or any material was used outside.

Q. When you first visited the mining property or this property which you had this mortgage on in June, 1909, did you observe the buildings in connection with the mining camp there?

A. I did.

Q. In what direction from the northwest of 15 were the buildings of the mining company at that time?

A. West from the northwest quarter of 15.

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

Q. When you were out there last Saturday, was it for the purpose of having the lines between these two quarter sections run, and determine on what property these buildings were?

A. Yes, sir.

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

Q. I understand you that at no time during any of your visits to the property in question were there any buildings or improvements of any kind in which building material such as this statement discloses was on the northwest of 15?

A. No, sir.

Upon cross-examination:

Q. I believe you said at the time this mortgage was made you knew about the material being furnished to the coal mine, did you?

A. I didn't know exactly what material or what was being furnished.

Q. You knew some was being furnished?

A. I know that he had some bills that he had incurred that he had to pay with this money, but I didn't know what bills they were.

Q. Did Mr. Kay give you the name of any of the people whom he was owing?

A. I don't remember that he did.

Q. You remember he stated to you he was owing the St. Anthony & Dakota Elevator Company any money?

A. I don't think so, at that time.

Respondent insists that this evidence fails to show knowledge upon the part of Mr. Peck that materials were being furnished for which a lien might possibly be claimed upon section 15. It is true, Mr. Peck answers his own attorney to the effect that he did not know that a lien would be claimed on section 15, and he also testifies in the same manner that he did not know that any materials were being furnished for use upon the northwest quarter of 15. This comes a long way, however, from denying knowledge that materials were being used upon the coal mine, and, in fact, he so states in the testimony above quoted: "You understood that there would be material furnished for the improvement of the mining property? A. Yes, sir." His testimony as a whole convinces a majority of the court that he was in possession of such facts regarding this building material as constituted notice in law that a lien might be claimed. December 15th the mining company paid the elevator company $258.05, leaving a balance at that time of $887.85. No other payments have been made. On the 17th of February, 1909, the elevator company filed a mechanic's lien describing the property as "a certain shed adjoining to entrance to mine, an engine

house, a bunk house, barn buildings, cook and dining house, and repairs on said coal mine, upon the following described lands of which the said White Earth Coal Mining Brick & Tile Company was then and is now the owner; to wit, N. W. ¼ section 15, 156–94, and lessor of N. E. ¼ of 16, 156-94 . . . ; that under and by virtue of said contract the said . . . company furnished the necessary materials for the shed, adjoining to entrance to mine and engine house, bunk houses, barn buildings, cook and dining house, and repairs on said mine as specified in the annexed account. . . . For which a mechanic's lien is hereby claimed . . . upon said shed adjoining to entrance to mine and engine house, bunk houses, barn buildings, cook and dining house, and repairs on said mine, including the land upon which the same is situated, under chapter 77 of the Civil Code of the state of North Dakota." The buildings are conceded to be entirely on section 16. The elevator company had no knowledge of the existence of the mortgage until all the materials mentioned in its claim had been furnished. In 1912 the defect in the description of the mortgage was discovered, and it was corrected in an action wherein the coal company was the sole defendant. Neither the lien nor the mortgage has been paid. The mortgagee brings this action in foreclosure, making the elevator company one of the defendants. The main controversy arises over the priority of those two claims. The sections of our Code applicable are § 6237, Rev. Codes 1905, which has since been amended and is now § 6814, Comp. Laws 1913. Said section reads as follows: "Any person who shall . . . furnish any materials . . . for the erection . . . of any building or other structure upon lands or in making any other improvements thereon . . . under a contract with the owner of such land, . . . shall upon compliance with the provisions of this chapter have for his . . . materials . . . furnished, a lien upon such building, erection or improvement and upon the land belonging to such owner on which the same is situated, or to improve which said work was done or the things furnished. . . . " Section 6242, Rev. Codes 1905, Comp. Laws 1913, § 6822, reads as follows: " . . . Liens under the provisions of this chapter shall be preferred to all other liens or encumbrances upon such building, erection or other improvement, and the land on which the same is situated, or to improve which the labor was done or things furnished or either of them, filed or docketed subsequent to the commencement of such building, erection or

improvement." Section 6243, Rev. Codes 1905, Comp. Laws 1913, § 6823, reads: "The entire land upon which any such building, erection or other improvement is situated, or to improve which the labor was done or things furnished, including that portion of the same not covered therewith, shall be subject to all liens created by this chapter to the extent of all the right, title and interest owned therein, by the owner thereof for whose immediate use or benefit such labor was done or things furnished, and when the interest owned in such land by such owner of such building, erection, or other improvement is only a leasehold interest, the forfeiture of such lease for the nonpayment of rent or of noncompliance with any of the other stipulations therein shall not forfeit or impair such lien so far as it concerns such buildings, erections and improvements, but the same may be sold to satisfy such lien and be removed within thirty days after the sale thereof by the purchaser." Section 6238, Rev. Codes 1905, Comp. Laws 1913, § 6818, provides: "If labor is done or materials furnished under a single contract for several buildings, erections or improvements, the person furnishing the same shall be entitled to a lien therefor as follows:

"1. If such buildings, erections or improvements are upon a single farm, tract or lot, upon all such buildings, erections and improvements and the farm, tract or lot upon which the same are situated.

"2. If such buildings, erections or improvements are upon separate farms, tracts or lots, upon all such buildings, erections and improvements and the farms, tracts or lots upon which the same are situated; but upon the foreclosure of such lien the court may in the cases provided for in this subdivision, apportion the amount of the claim among the several farms, tracts or lots, in proportion to the enhanced value of the same produced by means of such labor, or materials, if such apportionment is necessary to protect the rights of third persons."

We have set forth these various statutory provisions because we believe much of the confusion upon the subject of mechanic-lien law arises over the failure to notice the distinction between statutes in the various states. The mortgagee in his brief states its claims as follows: "The position of the plaintiff is that if the elevator company has a lien on the N. W. ¼ section 15, it is inferior to the lien of plaintiff's mortgage, because the mortgage was taken in good faith without notice of any lien or any right to a lien in favor of the appellant."

(1) Logically the first question for consideration is whether the elevator company acquired any lien upon the N. W. ¼ of section 15. The mining company does not contest this point, and the mortgagee "concedes that, as between the coal mining company and the appellant, the latter may sustain and enforce a lien against the N. W. ¼ of section 15, provided, however, that it appears satisfactorily to the court, that the contract between the coal company and the appellant was sufficient to say that the building material was to be used for improvements on such tract of land." Two excellent notes, one at 26 L.R.A.(N.S.) page 831, and another at 31 L.R.A.(N.S.) page 746, cover the law upon this subject exhaustively. We will not try to recite here the authorities collected at those two notes. At page 749 of the 31 L.R.A.(N.S.) note it is said: "Since mechanics' liens are of legislative creation, it becomes important to note the phraseology of the statutes in the various jurisdictions, for a part of what has been frequently termed the conflict among the cases is indeed traceable to the varying statutory provisions." The cases are arranged in groups. At page 750 of the note is the group of cases construing statutes which give a lien for material furnished "for" structures. At page 750 is the group of cases construing statutes which give a lien for materials furnished *"for construction or erection of structures."* Two pages later is given a group of decisions under statutes giving liens for material *"used or to be used"* in the structure. And upon the last page of the note the following summary is given: "Broadly and briefly to summarize the foregoing cases . . . it may be fairly said that there is a conflict among the decisions construing statutes which provide for a lien for materials furnished 'for' a structure; that where the lien is given for materials furnished 'for the construction' of an improvement, the decided weight of authority inclines to the view that the actual use of the articles furnished is not necessary. That, likewise, the actual use of the materials is held unnecessary where the legislature has subjected buildings to debts contracted for materials furnished for or in the erection thereof; but that where the lien is given for furnishing material 'used' or 'to be used' in an improvement, the rule is that the use of the materials furnished is a prerequisite to the enforcement of a lien."

As already stated, our statute is more favorable to the lien than any of those announced in the notes; for it not only gives a lien for materials

used *"for the erecting"* of the building, but moreover provides that the lien shall attach to "the entire land upon which any such building, erection, or other improvement is situated, or *to improve which* the labor was done or the things furnished." The following are some of the cases nearest in point: Beckel v. Petticrew, 6 Ohio St. 247; Small v. Foley, 8 Colo. App. 435, 47 Pac. 64; Burns v. Sewell, 48 Minn. 425, 51 N. W. 224; Berger v. Turnblad, 98 Minn. 163, 116 Am. St. Rep. 353, 107 N. W. 543. At page 838, 26 L.R.A.(N.S.) is found a group of mining cases under statutes somewhat similar to, though of course not identical with, our own. The only testimony covering the nature of the contract made between the coal company and the elevator company was furnished by one Hanson, who made the sale of the lumber in question, who testifies that the lumber was all to be used on section 15. Construing the language of our own statute then, we have no hesitancy in holding that the lien attached to the N. W. ¼ of section 15, although the buildings were actually erected upon the adjoining land. In view of respondent's concession that upon the facts, as we find them, the lumber company has a lien against the land, and that the main issue is the priority of such lien and the mortgage, we will not devote further time to this question. If more were needed to show that the lien is prior to the mortgage, we have but to point to the fact that the lien was actually filed against the N. W. ¼ of 15, on February 17, 1909, and that the mortgage, through the clerical error, was not filed against the proper land until 1912. Thus the mortgagee at that time had the additional knowledge and notice that a lien had actually been claimed and filed. It is further undisputed that the elevator company had absolutely no knowledge whatever of the mortgage. Under those circumstances the reformation of the mortgage had the effect of creating a new lien so far as the rights of the lumber company were concerned. See Chapman v. Fields, 70 Ala. 403; Provost v. Rebman, 21 Iowa, 419; Thompson-McDonald Lumber Co. v. Morawetz, 127 Minn. 277, L.R.A.1915E, 302, 149 N. W. 300.

(2) The next and most important question—the only one really argued in the briefs—is whether the mechanic's lien held by the lumber company is superior to the mortgage held by the loan company. We have already cited our statute, § 6242, Rev. Codes 1905, Comp. Laws 1913, § 6822, reciting that the lien shall be superior to all encumbrances filed or docketed subsequent to the commencement of such

building, erection, or improvement. This section is more favorable to the lienor than was § 5478, Comp. Laws 1887, upon which the decisions in Haxtum Steam Heater Co. v. Gordon, 2 N. D. 246, 33 Am. St. Rep. 776, 50 N. W. 708; James River Lumber Co. v. Danner, 3 N. D. 470, 57 N. W. 343; Bastien v. Barras, 10 N. D. 29, 84 N. W. 559; Turner v. St. John, 8 N. D. 245, 78 N. W. 340, were based.

From the first case we quote: "One lien or the other must be superior; and the legislature, in its wisdom, has seen proper to require that the mortgagee should take care of the mechanic's lien—usually insignificant in amount as compared with the mortgage—rather than that the mechanic, often a day laborer, should take care of the mortgage of the capitalist."

From the second case (Danner) we quote: "The strife is between a mortgagee of real property and the holder of a mechanic's lien thereon. So far, the mortgagee has been successful. . . . The appellant does not challenge the correctness of this ruling, so far as the land itself is concerned, but insists that his lien upon the building on the land is superior to that of the respondent's mortgage. . . . The statute gives the lien priority with respect to the entire erection." In the Barras Case the court says: "The sole controversy in the case is whether the mortgage constitutes a prior lien. . . . Plaintiff's mortgage was executed and recorded on February 24, 1897. A building known as The 'French College' was then in process of construction on the premises covered by such mortgage. The building was commenced on December 9, 1896, and was not completed until March 24, 1898. Three mechanics' liens were filed against the premises. They were filed approximately a year after plaintiff's mortgage was recorded,—the exact date not being material,—and were for labor and material furnished long subsequent to the recording of the mortgage. . . . If this were an action between the mortgagee and the lien claimants, in which the latter were seeking to make their lien relate back, the principle would be applicable, and, undoubtedly, such lien claimants could, by appropriate proceedings, have claimed and established their liens as prior to the mortgage upon the strength of the fact that the building was being erected when the mortgage was given."

From the St. John Case we quote: "It will be observed that the entire controversy is between parties asserting conflicting interests in the

same property, and is not between Turner, the creditor, and St. John, his debtor. . . . Actual work was begun March 4, 1891, and the building was completed January 3, 1892. January 11, 1892, Turner filed a mechanic's lien for an alleged unpaid balance of $22,680.25. . . . On June 1, 1891, he [St. John] executed a first mortgage for $40,000 on this property to the Security Trust Company. . . . Again, on November 27, 1891, St. John executed a second mortgage to the Security Trust Company for $10,000. . . . It is evident that these loans, which were negotiated by St. John, through Mr. Clifford, who was the secretary and general manager of the Security Trust Company, were made for purposes connected with the construction of this building. . . . It's lien is a valid lien, inferior to plaintiff's [Turner's], but superior to the interests of all the remaining defendants [the mortgagees]. . . . It is ordered and adjudged that the district court enter judgment of foreclosure and sale herein, establishing plaintiff's lien as a first lien upon the premises described in the complaint."

See also Kay v. Towsley, 113 Mich. 281, 71 N. W. 490; also four case notes as follows: 12 L.R.A. 33; 13 L.R.A. 705; 14 L.R.A. 306; 2 L.R.A.(N.S.) 615.

It follows that the mechanic's lien in the case at bar is superior to the mortgage if the mortgage was taken while the buildings were in course of erection. Upon this point we have already quoted the evidence. It is undisputed that the lumber was upon the ground on the 13th of November, 1908, almost a month before the mortgage was taken. We have also quoted the testimony of the managing agent of the loan company that, at the time the loan was made, he knew that buildings were being erected in connection with the coal mine, and that the property was on both 15 and 16. He also knew that the money was to be used in paying for these improvements. This, we think sufficient to show that the buildings were being erected at the time the mortgage was taken, and under the well-settled law the lien is superior to the mortgage.

(3) Section 6238, Rev. Codes 1905, Comp. Laws 1913, § 6818, above quoted, gives authority to the court, upon the foreclosure, to apportion the amount of the claim in proportion to the enhanced value of the tract if necessary to protect the rights of third persons. Whether the statute contemplates the assessment of a certain amount against the buildings when situated upon lands belonging to a stranger is not clear. However,

the general powers of a court of equity would allow such a holding. We therefore think that, in the sale of the premises to satisfy said lien, provision should be made that the buildings situated upon section 16 be first sold with the privilege of removal, and the balance, if any, due upon the lien be collected by sale of the land in 15. The trial court will modify its judgment to conform to the views herein expressed. Appellant will recover the costs of this appeal.

Goss, J. (dissenting, but concurring in result). Do not draw the same deductions from the testimony of the witness Peck as have the majority. This witness has denied explicitly all knowledge that material was being furnished for improvements upon the northwest of 15. And there is no proof of knowledge on his part that this land in 15, upon which he supposed he had taken his mortgage, was used in connection with and as a part of the mining property on 16, as both the entrance to and the dump of the mine and all buildings adjacent to it were entirely upon section 16. The finding of fact upon which is predicated the decision (to quote from the majority opinion)—"his (Peck's) testimony as a whole convinces a majority of the court that he was in possession of such facts regarding this building material as constituted notice in law that a lien might be claimed" upon the northwest quarter of section 15—seems to me to be utterly without foundation in the proof, unless the testimony be distorted and warped into something never intended by the witness. The simple fact that a loan of $2,500 was made by plaintiff upon this bare quarter section ought to be sufficient proof that plaintiff never suspected any possible facts existing that would warrant a claim by anybody of a mechanic's lien upon improvements on this land, notwithstanding that he may have understood that the elevator company had furnished material for the improvement of a mining property upon a different section altogether and upon which a miner's lien (as distinguished from a mechanic's lien) perhaps might have been filed. As for knowledge that the loan was to pay outstanding bills, any business man would have a right to assume that the reason a loan is made is that the mortgagee may pay up his indebtedness. Nor can I see anything in Peck's testimony to warrant any finding of evasiveness on his part, as would appear to be the conclusion of the majority from the emphasis that has been placed upon his statement that he did not know that a lien would be claimed on section *15*, the property upon which he took his

mortgage.   Of course he did not think a lien could be claimed upon that property; otherwise, he never would have loaned the owner $2,500 upon it as security.   The size of the loan would seem a prima facie sufficient refutation to any business mind of any such inferences.   Peck in Kemmare, over a hundred miles distant by rail, may have been negligent in not examining the property to ascertain, before loaning upon it, that 15 was used with 16 as one mining property, if such was the fact, but he was no more negligent in this respect than was the elevator company and its agents in the village of White Earth, almost within sight of the mine, in selling this material as claimed for use upon 15, and yet remaining ignorant that all of it was being used in the erection of buildings upon 16, a different property entirely.   And a month elapsed during which they were thus negligently delivering the materials and during which time all materials delivered were being diverted to other property. No reason existed in fact upon which to predicate notice to plaintiff company that the materials were being furnished for use upon 15 when concededly not a stick of this lumber was ever upon that section, and no notice is shown of the contract or of the fact that the northeast quarter of 16 was used with the northwest quarter of 15 as one mining property. Every inference of notice, actual or constructive, to plaintiff is wholly unwarranted and to that extent an injustice to it.   It is also flatly contrary to the findings of the trial judge who heard the testimony and understood the facts.

Nor can I wholly agree to the construction of our mechanics' lien laws as based upon the assumed hypothesis of notice had by plaintiff that materials were being furnished.   These statutes are broad enough without indulging in any presumption of fact upon which to further extend them.   And the construction announced seems to me to be an enlargement upon the statute already sufficiently broad.   "The laborer is worthy of his hire," and the materialman is likewise entitled to security for all improvements for which he has furnished materials, not only as against the purchaser of such materials, but as against those with actual notice of the source of such improvements, and also those who are by the improvements in course of erection constructively warned of the sale and use made of such materials; but further than this equity should not go toward awarding a preferential or privileged lien to the materialman.   And as well illustrative of this, the only distinguishing feature

34 N. D.—8.

between actual confiscation of plaintiff's property and the administration of equity in this case under the construction given of the mechanics' lien laws is the wholly unwarranted assumption that Peck either had notice or should have known that materials were being furnished for improvements upon 15, although concededly no improvement was ever erected with said materials thereon, and the value of the property mortgaged was not increased by use of these materials used upon another property. While authorities are cited in the majority opinion, I believe an examination of them will disclose that none are applicable here. It is very significant that able counsel presenting this case have not cited in their briefs the four North Dakota cases to which considerable attention is given in the majority opinion. My conclusion is that they are applicable only because declared so by forced reasoning. *And none of the authorities cited go to the extent of holding that constructive notice of a contract to furnish materials is operative without either actual notice thereof or the use of the materials upon the premises for which they were sold for use.* The only underlying reason for priority of such liens over mortgages taken during the furnishing of materials is the enhancement by their use of the value of the premises mortgaged.

Under the proof and a proper construction of the mechanics' lien laws, I affirm that had plaintiff taken its mortgage upon the northwest quarter of 15 and recorded the same in order that the materialman might have had constructive notice thereof before it perfected its mechanics' lien thereon, the loan company's mortgage would have had priority over this mechanic's lien. Smith v. Barnes, 38 Minn. 240, 36 N. W. 346. A careful analysis of the very authorities cited in the majority opinion will refute the conclusions there drawn. L.R.A.1915E, 302, annotating Thompson-McDonald Lumber Co. v. Morawetz, 127 Minn. 277, 149 N. W. 300, is cited in the majority opinion. It illustrates the application made of authority. The case cited shows the extremes to which constructions enlarging mechanic's lien laws may lead. Are we headed the same way and is this case not the opening wedge? The following is from the annotator's note thereto at page 302, *viz.:* "Under the rule adopted by the court in Thompson-McDonald Lumber Co. v. Morawetz, the owner is not safe unless he is protected by a bond, in settling with his contractor after ninety days (or other period for filing liens) has expired since the last delivery of material upon the premises, even if the record is

free from liens at the time. A lien may be filed later for material that he never saw and never heard of, and the lien may include the price of other material for which no lien could be filed on account of expiration of the lien period, but for the fact that it was furnished by the same materialmen who furnished the unheard of material. So, the owner takes the risk in settling without a bond, and a search of the mechanics' lien record is no protection to him. But if the interpretation is sound the practical business world, except bonding and surety companies, may have recourse to the legislature for relief."

But it was as unnecessary to construe the mechanics' liens laws in this case as it was to indulge in the assumption that the loan was made with notice of a right in the lumber company to an inchoate lien. The mechanic's lien was fully perfected without notice of the mortgage and before any mortgage as to the holder of it was either created or recorded. As to the mechanic's lien holder plaintiff's mortgage was not created until the recording of the decree of reformation in 1912, while the mechanic's lien had been perfected by filing the claim therefor in 1909. "The reformation (of a mortgage) was the creation of a mortgage as to the land which had been omitted from the mortgage as drawn," as to intervening bona fide lien holders without notice. Chapman v. Fields, 70 Ala. 403. In Provost v. Rebman, 21 Iowa, 419, it is said: "This right of redemption might arise and exist on the ground that, by reforming the mortgage so as to make it include property not before described in it there is in effect created a mortgage as to such property at least; and to hold that the prior decree of foreclosure barred the right of redemption would be to create a mortgage and cut off the equity of redemption at a single stroke. This a court of equity would not do." See also White v. Schaffer, 97 Md. 359, 54 Atl. 974; Wheeler v. Kirtland, 23 N. J. Eq. 13; Blodgett v. Hobart, 18 Vt. 414; Hawkins v. Pearson, 96 Ala. 369, 11 So. 304; Davenport v. Sovil, 6 Ohio St. 459; Van Thorniley v. Peters, 26 Ohio St. 471; Straman v. Rechtine, 58 Ohio St. 443, 51 N. E. 44. With the law established beyond possibility of question, that the mechanic's lien has priority over the mortgage because of the wrong description in the mortgage necessitating its reformation, making it as to the elevator company the subsequent creation of a mortgage thereby; and under the affirmative proof that the elevator company had no notice whatever that plaintiff had loaned upon the security of northwest quarter

of 15 and without any constructive notice thereof imputed, it was wholly unnecessary, as has been done, to construe the mechanics' lien laws in this case. "Sufficient unto the day is the evil thereof." This unnecessary holding, giving an extended construction to our mechanics' lien laws that may work virtual confiscation of prior mortgagee's rights, may prove a future embarrassment if its sting is not sooner removed by legislative action limiting and defining the limits of the land to which such a lien may attach. While for reasons herein stated, I concur in the judgment ordered, yet I insist that there was no need of any extension by construction of an already sufficiently wide open mechanic's lien statute. Concurrence is entered in the decision on the ground that the reformation of the mortgage was as to the materialman a creation of the mortgage subsequent to its liens. As to all else contained in the majority opinion, am forced to dissent.